**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROBERT BRANCH : | |
| : | Civil Action No. 06-1839 (PGS) |
| Plaintiffs, : | |
| : | **OPINION** |
| v. : | |
| : | |
| ERIC STOKE, DR. KESSELMAN, : | |
| DR. KURRA, DR. REED, WANDA : | |
| CARFERO : | |
| : | |
| Defendants. : | |

This matter comes before the Court on motions for summary judgment by Defendants Eric Stokes (Stokes), Assistant Superintendent of Northern State Prison (NSP), Wanda Carrero (Carrero), Staff Advisor at NSP and Dr. Gayle Kesselman ( "Kesselman").

On April 20, 2006, Plaintiff, Robert Branch ("Plaintiff" or "Branch") brought the suit under 42 U.S.C. § 1983 alleging a violation of his constitutional rights by requiring injections of antipsychotic drugs without his authorization during his incarceration at Northern State Prison ("NSP") in Newark, New Jersey.

### STATEMENT OF FACTS

Robert Branch is currently serving a five-year sentence at NSP for possession of a deadly weapon resulting from his use of a bicycle chain in an altercation. Branch has a "long history of schizophrenia with multiple incarcerations for violent crimes" and was hospitalized numerous times in the 1970s and 1980s.

Kesselman, a psychiatrist, performs psychiatric evaluations for NSP. Her initial interaction with Branch was on September 13, 2005, after Branch had been transferred from the Central Receiving and Assessment Facility ("CRAF") to C-Block. Those patients who are transferred from CRAF are required to see a psychiatrist. Branch informed Kesselman he had "four psychiatric hospitalizations in the past." Additionally, Branch told Kesselman that he had been diagnosed as "criminally insane" during one the four hospitalizations. After reviewing Branch's past medical charts, Kesselman determined that Branch had been arrested 77 times, and had a history of "hallucinations and religious delusions". Although Branch had a prior history of psychiatric ailments, he had not been prescribed psychotropic medication for at least fifteen years prior to February 2006. Kesselman did not prescribe any medication for Branch at this initial meeting.

On December 26, 2005, Branch alleges he was attacked by an inmate on the food line. As a result of the fight, three of Branch's teeth were knocked out and he fractured three of his ribs. Branch was taken to the hospital and was placed in infirmary for two days. After the two days, he was released to the Special Needs Unit. During this period, the only medication Branch had been given were for "his ribs and pain killers."

On January 10, 2006, Dr. Kesselman saw Branch after he was admitted to the Stabilization Unit. According to Dr. Kesselman, Branch's thoughts were "paranoid and unrealistic," and he claimed that "the mental staff was conspiring against him." Dr. Kesselman diagnosed Branch with "chronic paranoid schizophrenia and believed that he would benefit from medication." Due to recurring reports of "agitation, poor impulse control and aggressive behavior," Dr. Kesselman prescribed "anti-psychotic medication" for Branch. Although Dr. Kesselman prescribed the medication, Branch failed to voluntarily take the medication because he was allegedly allergic to

2

psychotropic drugs. According to Branch, the psychotropic drugs made him "depressed and lethargic." The drugs also caused "memory impairment, inner feelings of restlessness, and involuntary movement of body parts." Moreover, the medication made him unable to "function for three days" after consumption and "made him lose his taste for food." Due to Branch's refusal to take the medication, Dr. Kesselman initiated a protocol for involuntary medication administration as required by regulation.

Prior to initiating a forced medication protocol, a Treatment Review Committee ("TRC") must determine whether such a step is necessary. N.J.A.C. §10A:16-11.1.

On January 30, 2006, Carrero, who was acting as Branch's Staff Advisor, provided Branch with a "Notice of the Hearing to Consider Recommendation of Involuntary Administration of Psychotropic Medication" for a period of one month. The hearing would be before the NSP Treatment Review Committee ("TRC"). On January 31, 2006, the TRC hearing was conducted.[1] The TRC was comprised of defendant Eric Stokes as Chairman and NJDOC representative, Dr. Kurra as psychiatrist, and Dr. Reed as psychologist. Branch was present at the hearing and made a statement on his own behalf. He indicated that he is allergic to anti-psychotic medications, that they make him feel like he has "Down's syndrome," and that he has had "out of body experiences" as a result. He threatened legal action if he were forced to take medication.

After considering much evidence including Progress Notes, Involuntary Medication Report by Dr. Kesselman, Treatment Plan, Electronic Medical Records, Psychiatric Evaluation, Medication Administration Records and Branch's statement, the TRC determined that Branch presented 1) a

---

[1] Branch does not argue that the period of one day to present evidence and be ready is insufficient.

substantial risk of imminent harm to himself, 2) that he will be unable to care for himself, and 3) that he would be incapable of participating in his treatment plan without medication. As a result, the TRC voted in favor of medicating Branch for 30 days.

On February 1, 2006, Carrero delivered the hearing results to Branch and explained the appeal process which included an appeal to the Statewide Medical Director. Branch appealed the TRC results to the Statewide Medical Director. In his notice of appeal, he stated

> This is my statement's of law, that I want to be understood on my appeal to the head, chief physician. Prisoners have a right under the Due Process Clause to avoid the involuntary use of antipsychotic medication (haldol, prolixin, mellaril, and similar drugs), but prison officials may force the prisoner to submit to them if she has a serious mental illness, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. This holding is an exception to the general rule that competent adults are entitled to refuse medical treatment.
>
> Due process requires procedural protections before involuntary medication, but not a judicial hearing. It is enough if there is a decision by medical professionals who are not currently involved in the prisoners diagnosis or treatment, along with notice and adversary hearing, the right to present and cross examine witnesses and the assistance of an independent lay advisor who understands the psychiatric issue involved (not a lawyer).

The Notice of Appeal by Branch to the Statewide Medical Director concerns the involuntary nature of Branch's medication. It is unclear whether the Statewide Medical Director was addressing Branch's Notice of Appeal or the TRC's ruling as the root of his decision. On February 3, 2006, Dr. Rusty Reeves affirmed the decision of the TRC to involuntarily medicate Branch. His response was curt and did not set forth the reasons for his decision. He stated:

> I have reviewed Mr. Branch's appeal. I affirm the decision of the Treatment Review Committee to involuntarily medicate Mr. Branch. Mr. Branch's appeal is denied.

4

Sometime around March 1, 2006, an application to extend involuntary administration of medication for another 180 days was submitted by Dr. Kesselman. The TRC reviewed and concurred with the recommendation on March 7, 2006. Unlike the initial proceeding, Branch did not appeal to the Statewide Medical Director.

On May 8, 2006, Branch filed this civil rights Complaint against Stokes, Carrero, Dr. Kesselman, Dr. Kurra and Dr. Reed. Plaintiff alleges due process violations and medical deliberate indifference relating to the initial TRC decision to place him on a forced medication protocol.

Branch contends that he filed two other grievance forms to redress the forced medication (Pl.'s Br. Opp'n Mot. Dismiss at 4). However, the grievance forms Branch filed concerned his status as an inmate and how it affected his ability to work. (Def.'s Exs. H, I, and J).

## LEGAL ARGUMENT

### I.

### SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be

drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48.

## II.

The government defendants initially argue that Branch's suit must be dismissed for failure to exhaust administrative remedies pursuant to The Prison Litigation Reform Act of 1995 ("PLRA"). This Act requires a prisoner to exhaust all available administrative remedies before challenging prison conditions in federal court. *42 U.S.C.§ 1997E(a)* (1980).  The exhaustion requirement applies to all prisoners who file their original complaint while in custody. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d Cir. 2002).

The PLRA requires prisoners asserting a claim under 42 U.S.C. § 1983 or any other federal law to first exhaust administrative remedies. 42 U.S.C. § 1997e(a). The PLRA does not require

6

exhaustion of all remedies; rather, it only requires exhaustion of such administrative remedies "as are available." *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (citing *Camp v. Brennan*, 219 F.3d, 279, 281 (3d Cir. 2000)).

According to the Supreme Court, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 19 (2006). "Proper exhaustion" means the plaintiff must adhere to the administrative review process including procedural rules and deadlines. *Id*. at 17.

Failure to exhaust is an affirmative defense which defendant must prove under the PLRA. *Croak*, 312 F. 3d at 111. Defendants argue that prior to filing suit the plaintiff must follow the administrative process for Non-Emergent Involuntary Medication Administration (NEIMA) and the ordinary grievance procedure with regard to conditions within the facility.

For the administration of medication pursuant to NEIMA, the treating physician must initially explain the benefits of taking the medication; but if the treating physician finds that the inmate is a danger to himself (among other things) and refuses the medication, the doctor may recommend administration of the drugs by forwarding a report to the Regional Director of Psychiatry. Once the Director is satisfied that the report is complete, the Director appoints a Treatment Review Committee. In this instance, the TRC included a psychiatrist (Dr. Kurra), a psychologist (Dr. Reed) and the designee of the warden (Eric Stokes). The TRC must conduct a thorough and independent investigation, and hold a hearing on notice to the inmate. Upon reading a decision, the inmate will be given a copy of it, and advised of his right of appeal. The appeal is sent through the staff advisor (Carrero) to the Statewide Medical Director (Dr. Reeves) who must conduct a review within two days. There is nothing within this provision that advises an inmate to also pursue other avenues of appeal to challenge the involuntary administration of drugs.

As noted above, the State defendants argue that Plaintiff must also file an appeal under the ordinary grievance procedure for wrongs incurred.  The ordinary grievance procedure is succinctly written.  (Welch Certification Exhibit L).  It states in full:

> Northern State Prison affords its general population several methods for appeal and/or grievances.
>
> Appeals concerning decisions adjudicated through the institutional disciplinary program should be handled through the appeal process inherent within the disciplinary program. Reference is made in the New Jersey Administrative Code 10A-4.
>
> Institutional Classification Committee decisions may also be appealed by submitting a written notice to the office of the Administrator.  The appeal should be submitted within 48 hours of the Classification Committee's meeting date.
>
> Any complaints involving staff members should be written on an "I.R.F." (Inmate Remedy Form) and forwarded to the office of the Administrator. Upon receipt of the complaint, it will be reviewed and forwarded to the appropriate department head for investigation. The results of the investigation will be reviewed and a response will be sent.  If no response is received by the inmate within 30 days, that inmate may submit an Administrative Remedy Form.

The grievance procedure itemizes three different types of grievances.  There are decisions of disciplinary programs (N.J.A.C. 10A:4-1), classification appeals, and ones against staff by filing an Inmate Relief Form (I.R.F.). Defendants argue that this last category of appeal should have been filed by Branch because he is upset with the decision of staff.

Defendants' argument is specious.  It is incomprehensible that Branch would have known that an appeal should have been filed against staff by filing an IRF.  Second, in determining injection of medication, the appeal must be to professional practitioners who are competent in the field. As a result, NEIMA requires that the TRC be comprised of a psychologist and psychiatrist as well as the warden's designee. The appeal is to the state wide medical director.  All of these persons are

8

competent to make a decision. The other staff related appeal does not present such a guarantee. The grievance procedure is silent as to the qualifications of the reviewers; but most likely they are non-physicians. And lastly, if the drafters of the NEIMA envisioned an appeal through the general grievance provisions, they should have written same in the notice of appeal given to Branch.

It is axiomatic that when interpreting statutes or regulations, the Courts will also apply the one that is more specific. *See*, *e.g.*, *In Re Guardianship of Penn.*, 15 F.3d 292, 294 (3d Cir. 1994). In addition the ordinary legal practitioner undertaking a case similar to this would never envision that the ordinary grievance procedure rules were a necessary supplement to NEIMA procedure. To create such a rule is inviting new claims. Accordingly, the proper exhaustion on this case is limited to those steps set forth in the NEIMA.

The issue which inures is whether the plaintiff complied with the exhaustion requirements of NEIMA. In this case there were two NEIMA decisions made. The first one was insertion of medication for 30 days and the second for 180 days. The procedures section of NEIMA is very exact in stating the initial "duration of involuntary medication administration" is 30 days, and thereafter 180 day extension may be granted under certain circumstances. The appeals section of NEIMA also contemplate appeals to the medical director from "the 30 day or 180 day period of involuntary medication." In this case, Branch exhausted his administrative remedies with regard to the 30 day proceedings. As such, his suit here may continue. In contrast, Branch failed to appeal to the statewide medical director with regard to the 180 day extension. Since Branch did not exhaust his administrative remedies regarding the 180 day extension, his suit as to that claim is dismissed for failing to exhaust remedies.

## III.

The plaintiff sues Wanda Carrero, a staff advisor at NSP. By way of background, Plaintiff filed a complaint on the form which the Clerk's Office provides to pro se prisoners along with an instruction sheet. The sole allegation against Wanda Carrero within the Complaint is that she "made decision to give me the wrong medication." Giving Mr. Branch all reasonable inferences, no reasonable jury could find this assertion to be true. With regard to the first NEIMA proceeding, Ms. Carrero acted as a staff advisor. She acted as a liaison between mental health department and the health department. In this instance, her duties included reviewing with Mr. Branch the steps to safeguard his rights from arbitrary involuntary administration of medication pursuant to NEIMA, and his right of appeal. Ms. Carrero is not a physician, and did not make any decision with regard to medicating plaintiff during the 30 day period. As such, plaintiff's complaint that she "made decision to give me the wrong medication" is not bourne out by the record. In order to prove a §1983 claim, plaintiff must prove, among other things, that there is a causal connection between the actions of the defendant and the constitutional injury suffered. *Monroe v. Pape*, 365 U.S. 167, 187 (1961) *rev'd on other grounds, Monell v. Dep't of Soc. Svs.*, 436 U.S. 658 (1978). In this case, there is no such connection. The action against Ms. Carrero is dismissed.

## IV.

Eric Stokes, the assistant warden, also seeks dismissal because (1) he did not act with deliberate indifference to Branch's medical needs[2] and (2) the NEIMA provision satisfies procedural

---

[2] Stokes also argues that he is entitled to sovereign immunity under the Eleventh Amendment for any acts taken in an official capacity. The complaint is ambiguous as to whether Stokes is being sued in a "personal" or "official" capacity. Giving all inferences to plaintiff, it is concluded that the Complaint is sufficiently broad to allege personal claims. *See*, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("On the merits, to establish *personal* liability in a §1983

due process concerns. Mr. Stokes was the warden's representative on the first TRC which permitted the first 30 day administration of medication.

An inmate's Eighth Amendment right to be free from cruel and unusual punishment extends to his entitlement to adequate medical care. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 344-45 (3d Cir. 1987), 486 U.S. 1006 (1988). See also *White v. Napoleon*, 897 F.2d 103, 108-09 (3d. Cir. 1990). As such, a prison administrator's deliberate indifference to an inmate's medical condition constitutes a violation of the inmate's Eighth Amendment rights. "Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citations and quotation marks omitted). "[D]eliberate indifference is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Generally, deliberate indifference standard is a two part test. The prisoner's treatment must be serious, and defendants must have been deliberately indifferent to same. Monmouth *County v. Lanzaro*, 834 F. 2d at 345.

Defendant Stokes relies on two Third Circuit cases. They are *Durmer v. O'Carroll*, 991 F.2d 64 (3d. Cir. 1993) and *Spruill v. Gillis*, 372 F.3d 218 (3d. Cir. 2004). In *Durmer*, the Third Circuit upheld the District Court's grant of summary judgment dismissing claims of deliberate indifference against two prison administrators (a warden and the Commissioner for Corrections) who had received letters from the inmate concerning inadequate medical care provided by his treating physician. *Durmer v. O'Carroll*, 991 F.2d at 69. The court found summary judgment to be appropriate as the two administrators could not be charged with deliberate indifference by simply

---

action, it is caused the deprivation of a federal right.").

failing to respond to the letters of an inmate already receiving medical care. *Id.* Similarly in *Spruill*, the court dismissed deliberate indifference claims against a housing unit manager based on the fact the inmate was receiving medical care from prison physicians. *Spruill*, 372 F.3d at 236-37. The court based its decision on the logical division of labor and the administrators' need to delegate responsibility to others, including capable medical professionals. *Id.* This case is distinguishable because Stokes, as a member and chair of the TRC first had a direct role in Branch's medical treatment; however, it does not per se overcome the deliberate indifference standard. In this case, the proofs are that Branch (a) was involved in a bloody altercation where he lost some teeth; (b) had been arrested 77 times during his life; (c) was imprisoned for assaulting a person with a bicycle chain; (d) hallucinated and (e) was diagnosed as a paranoid schizophrenic. Plaintiff minimizes these findings by asserting that Stokes had little knowledge of the defendant because he did not know whether Branch was a troublemaker, frequently disciplined, and admitted at depositions that Branch's was not one of the most violent criminals at the prison.

Stokes, in his role as TRC member, reviewed the medical records of Branch and the recommendations of Dr. Kesselman prior to making any decision. Certainly, such conduct appears reasonable, and does not sink to the level of deliberate indifference as defined above.

## V.

Similarly, Kesselman moves for summary judgment claiming that she did not violate Plaintiff's First, Eighth or Fourteenth Amendment rights. Kesselman claims that she had no responsibility to notify Branch of any hearing, nor final responsibility for the decision to involuntarily medicate him; that no action of hers caused Branch to be deprived of his rights to free speech, free exercise of religion, or redress to the government; and that her actions did not rise to the

level of "deliberate indifference" necessary for a finding of a violation of Branch's Eighth Amendment rights.

As stated above, Branch relies on *Durmer*, 991 F.2d at 64, in support of his Eighth Amendment claim. In *Durmer*, plaintiff's treating prison physician waited four and a half months to send plaintiff, a victim of a pre-incarceration stroke, to physical therapy when that therapy had been prescribed by a pre-incarceration treating physician and recommended by at least one post-incarceration specialist to whom plaintiff was referred. *Id.* at 68. In that case, the Third Circuit reversed the district court's grant of summary judgment in favor of the treating prison physician, stating that there was a genuine issue of material fact as to the motivations behind the treating prison physician's delay in treatment. *Id.*

*Durmer* is factually distinguishable from the case at bar. Here, Branch claims that Kesselman's "knee-jerk reaction" to his altercation serves as a sufficient factual issue to prevent a grant of summary judgment in her favor. However, this argument actually undermines Branch's position. As Branch states in his opposition brief, several months prior to the altercation, Kesselman recommended a course of antipsychotic medications, but never once did she move to involuntarily medicate Branch despite his violent history. Upon treating Branch after the altercation, Kesselman's opinion changed, and she viewed Branch as a danger to himself and others based upon the altercation, Branch's prior arrest record for violent crimes, his incarceration for assault, and his agitated state at the time of the examination. Only at that point did Kesselamn recommend Branch be medicated involuntarily. There was no "wait and see" approach here, as in *Durmer*, and no

13

significant delay after the triggering events in moving for involuntary medication.[3] The fact that Branch characterizes Kesselman's reaction as "knee-jerk" is not the same as disputing her motivations.

Further, medical malpractice, without more, does not rise to the level of reckless disregard necessary to violate a prisoner's Eighth Amendment rights. *Estelle*, 429 U.S. at 105-06. Therefore, even if Kesselman's "knee-jerk reaction," including some alleged failure to review Branch's entire medical file prior to prescribing antipsychotic medication, violated a medical standard of care according to Branch's expert, it does not rise to the level of "deliberate indifference" under the Eighth Amendment. Viewing all facts in a light most favorable to the plaintiff here, there appears to be no genuine issue of material fact as to the reasons for Kesselman's recommendation of involuntary medication, and therefore summary judgment as to these claims is proper as a matter of law.

**VI.**

Kesselman also moves for summary judgment as to the First Amendment claims against her. Branch's opposition brief does not directly address Kesselman's arguments that no action of hers caused Branch to be deprived of his rights to free speech, free exercise of religion, or redress to the government, except to say that as his treating physician, Kesselman had a great amount of influence over the TRC.

The First Amendment states, "Congress shall make no law respecting an establishment of

---

[3] The Court recognizes that, according to records, Branch was released from the infirmary to the Special Needs Unit two days after the altercation, on or about December 28, 2005, and was not seen by Dr. Kesselman until January 10, 2006. At oral argument, Kesselman asserted that the delay between prescribing the antipsychotic medication to Branch and the TRC hearing was due to an effort on the part of Kesselman herself to have Branch voluntarily take his medication. Only after having refused to voluntarily take the medication did Kesselman make her recommendation for involuntary medication.

religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment is applicable to the states through the due process clause of the Fourteenth Amendment. *Stromberg v. California*, 283 U.S. 359, 368 (1931). However, in the prison setting, an inmate's First Amendment rights may be significantly circumscribed . *Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir. 1999). The test for protection of these rights is whether the individual's rights have to do with either his or her status as a prisoner, or if the rights sought to be protected are rationally related to the legitimate penological objectives of the corrections system. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). This standard of review is quite deferential to the prison authority, *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), and necessarily balances the interests of the prison in security and efficiency against the constitutional rights retained by prisoners. *Thaddeus-X*, 175 F.3d at 390.

As to the first clause of the First Amendment, which forbids the compulsion by law of the acceptance of any religion, and which safeguards the free exercise of religion, *United States v. Ballard*, 322 U.S. 78, 86 (1944), this Court agrees with Kesselman that she neither compelled him to accept religion nor prevented him from exercising his chosen form of religion. Similarly, as to the second clause of the First Amendment, which forbids the restriction of free speech and freedom of the press, *see De Jonge v. Oregon*, 299 U.S. 353, 365 (1937), this Court likewise agrees with Kesselman that Branch has failed to submit any evidence of suppression of his freedom of speech by Kesselman herself. As to the third clause of the First Amendment, which deals with freedom of assembly and the right of citizens to petition the Government for redress of wrongs, this Court also agrees with Kesselman that she has, in no way, prevented Branch from having access to the court.

It is well established that prisoners have a First Amendment right of access to the courts. *Lewis v. Casey*, 518 U.S. 343 (1996). While this is not a generalized right to litigate every claim, it is a right granted to inmates "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id.* at 355. In order for an inmate to properly state a claim for denial of access to the court system, he must establish that he suffered an injury in fact by showing that the defendant's actions somehow prevented him from pursuing a nonfrivolous claim. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, it is clear that Branch was not denied access to the courts by any defendant to this action, least of all Kesselman. Branch appeared at both TRC hearings, appealed the result of one of those hearings, and filed the instant action before this Court. Nowhere has Branch provided evidence that Kesselman's actions in recommending involuntary medication have kept him from the courts. There is no genuine issue of material fact alleged as to Branch's First Amendment claims, and therefore, even viewing the facts in a light most favorable to him, summary judgment as a matter of law is appropriately granted to Kesselman as to these claims.

## VII.

As aforementioned, Stokes and Kesselman contend that Branch's due process claims do not meet muster. It is well settled that a inmate has a liberty interest to be free from arbitrary administration of medication. A policy which treats an inmate against his will may comply with substantiative due process requirements when the inmate presents a danger to himself or others, and the treatment is in his medical interest. *Washington v. Harper*, 494 U.S. 210, 224-25 (1990).

The analysis of a substantive due process claim hinges on the same standard as the Eight Amendment violation – deliberate indifference. *See Vitak v. Jones*, 445 U.S. 480, 493-94 (1980).

Here, the plaintiff proffers the report of Daniel Greenfield, M.D. dated November 27, 2007, who opines that the involuntary administration of drugs to Stokes was inappropriate. Dr. Greenfield concluded:

> [I]t is not my psychiatric/neuropsychiatric/addiction medicine impression or opinion that such forced medication was medically necessary during the period of time that it was given to Mr. Branch, especially in view of the lengthy periods of time before and after that period of medication during which Mr. Branch was not treated with such antipsychotic medications, which were evidently not felt to have been clinically indicated or medically necessary during those periods of time.
>
> ....
>
> . . . Mr. Robert Lee Branch's non-emergent forced antipsychotic medication during the period of time in question at NSP was a deviation from accepted standards of practice in a general sense, and more specifically, was also a deviation from the requirements for such forced medication on inmates at NSP in effect during the period of time in question.

(See the report of Daniel Greenfield MD, MPH, MS, at 23-24, attached to the Welch Certification as Exhibit N). Despite Dr. Greenfield's opinion, Plaintiff still bears the burden of showing deliberate indifference. At the time, Stokes relied upon the report of Dr. Kesselman (and as reviewed by her supervisor) as well as the collaborative input of the psychiatrist and psychologist with whom he participated on the TRC. Under these circumstances, there is no evidence of deliberate indifference.

Branch argues that his procedural due process rights were violated in one respect.[4] *Harper,* 494 U.S. at 224-25. This one procedural aspect concerns the independence of the TRC committee.

---

[4] Plaintiff admits "the procedural guidelines for non-emergent forced medication implemented by the New Jersey Department of Corrections comport with the requirements by Harper."

Plaintiff correctly points out that none of the TRC members may be directly involved in the inmate's current treatment. (See NEIMA policy and procedure attached to Welch Certification Exhibit C). In this case, Dr. Reed, the psychologist on the TRC "treated Branch on December 27, 2005 immediately following his altercation." From this fact, plaintiff deduces that Stokes, as chair of the TRC, permitted same. This conclusion does not comport with the facts. First, there is no proof that Stokes knew Branch was treated by Dr. Reed. Secondly, Dr. Reed, as a psychologist, did not prescribe anti-psychotic drugs, hence this course of treatment was different. Third, his examination was more than a month before the hearing, so it is questionable whether Reed was "currently involved" with Branch's treatment. Lastly, and most importantly, Stokes did not appoint Reed to the TRC. The NEIMA provision requires the regional medical director to designate the professional members of the committee. The pertinent section reads:

> The Regional Director of Psychiatry or designee will identify and appoint a non-treating psychiatrist and psychologist who might serve on the Treatment Review Committee and list the names and pager numbers of the identified clinicians on form MR-052.

The argument that Stokes "permitted" Dr. Reed to sit on the TRC is not true. There is no causation between the action of Stokes and the constitutional wrongdoing.

Further, as to Kesselman's involvement, Branch has failed to prove deliberate indifference on her part as to the involuntary medication procedure. As with Branch's Eighth Amendment claims, Kesselman's actions, even if they constituted medical malpractice, do not rise to the level of reckless disregard or intentional injury necessary to prove deliberate indifference to Branch's medical needs.

In conclusion, the motions for summary judgment by defendants Kesselman, Carrero, and Stokes are granted, and Branch's complaint is dismissed as to these three defendants in its entirety.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

February 24, 2009